**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROLAND DAVID and AVIGDOR MOCHE,<br><br>         Plaintiffs,<br>     v.<br><br>HUMAN GENOME SCIENCES, INC., H. THOMAS WATKINS, ARGERIS N. KARABELAS, and GLAXOSMITHKLINE PLC<br><br>         Defendants. | Case No. _____ |

**CLASS ACTION COMPLAINT FOR
INJUNCTIVE AND OTHER RELIEF**

Plaintiffs Roland David and Avigdor Moche ("Plaintiffs"), on behalf of themselves and as a class action on behalf of the shareholders of Human Genome Sciences, Inc. ("HGS" or the "Company") seek to temporarily enjoin the above-named defendants (the "Defendants") from proceeding with an attempt to sell the Company to GlaxoSmithKline plc ("GSK") through a $3.6 billion dollar tender offer (the "Tender Offer"), announced on July 16, 2012 and scheduled to close on July 27, 2012. As discussed in full detail below, HGS is recommending the Tender Offer to its shareholders through a complex, 80-page amendment (the "Amendment")[1] to a prior Proxy Statement which actually recommended **against** a tender offer from GSK in May of 2012. Moreover, the Amendment was first released after the close of markets on July 19, 2012, only 6 business days before the close of the Tender Offer. As such, the Amendment and the Tender Offer are materially

---
1

deficient in that there is insufficient time for HGS's investors to digest the information contained therein and make an informed decision on whether to tender their shares. In trying to force through the Tender Offer in such an unfair and coercive manner, Defendants are in violation of the Federal securities laws and well accepted principles of equity.

1.  In April 2012, GSK made an offer for HGS at the fire-sale price of $13.00 per share, or $2.59 billion in the aggregate, although the Company had traded in the $14.00 range within the preceding 7-month period. HGS management rightfully rejected this overture, finding the consideration to reflect a vastly deficient valuation of the Company and describing the offer as an opportunistic move to capitalize on the Company's temporarily depressed share price.

2.  GSK then quickly took its bid hostile and, on May 10, 2012, initiated an unsolicited tender offer of $13.00 per share to HGS's shareholders, which was scheduled to close on June 7, 2012. On May 17, 2012, HGS issued a Schedule 14D-9 (the "Proxy") advising the Company's shareholders that:

> The Board has reviewed the [GSK] Offer with the assistance of the Company's management and legal financial advisors and, after careful consideration, the Board has unanimously determine that the Offer is inadequate, undervalues the Company and is not in the best interests of the Company and its stockholders. Accordingly, and for the reasons described in more detail below, the Board of Directors of the Company unanimously recommends that you REJECT the Offer and NOT TENDER your Shares pursuant to the Offer.

3.  In defense of its recommendation against tender, HGS cited to Unfairness Opinions from both Credit Suisse Securities (USA) LLC and Goldman Sachs & Co., and stated in its letter to shareholders that GSK's tender offer was attempting to "capitalize on

recent Share price dislocation, approach[ing] HGS while its shares were trading near a 52-week low." Indeed, HGS was trading in the $7.00 per share range in April 2012, but had traded as high as $23.84 per share within the preceding year.

4.     GSK would ultimately extend its hostile tender offer through July 16, 2012 and, as that closing date was set to expire, increased its tender offer to $14.25 per share, which was approved by the HGS Board.

5.     The Proposed Acquisition was announced via joint press release between the Company and GSK on July 16, 2012, and the closing of the Tender Offer was announced for July 27, 2012. The press release gave only a generalized explanation for the Company's acceptance of the revised Tender Offer and the Merger Agreement filed with the U.S. Securities Exchange Commission the same day discussed the mechanics of the process, but not an explanation for why the Tender Offer was in the best interest of the Company and its shareholders and failed to include any fairness opinions from any financial advisors.

6.     Finally, after the close of business on July 19, 2012, HGS issued an 80-page amendment to the Proxy recommending that the Company's investors now tender their shares at the $14.25 price by the July 27, 2012 closing date. As such, HGS's shareholders have only 6 business days to review this recommendation and make an informed decision as to whether it is in their interest to tender their shares.

7.     Section 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") is designed to "insure that public shareholders who are confronted with a tender offer will not be required to respond without adequate information. *Schreiber v. Burlington*

*Northern, Inc*. 472 U.S. 1, 2 (1985).   Also, according to SEC Rule 14d-4(d)(1): "a material change in the information published or sent or given to security holders shall be promptly disseminated to security holders in a manner reasonably designed to inform security holders of such change."   Moreover, Courts have interpreted these disclosure requirements as necessitating an appropriate amount of time for investors to review said materials prior to the closing of the tender.[2]

8.   Defendants have violated the Federal securities laws and should be enjoined from closing the Tender Offer on July 27, 2012 and said Tender Offer should be held open for a reasonable period of time in order to allow HGS's investors the opportunity to review its terms and the recommendation of the Company in a meaningful manner.

## THE PARTIES

9.   Plaintiffs are citizens of the State of New York and have been holders of HGS common stock at all relevant times.   Plaintiffs also currently hold HGS common stock.

10.   Defendant Human Genome Sciences, Inc. is a Delaware corporation that maintains its corporate headquarters in Rockville, Maryland.   HGS is a commercially focused biopharmaceutical company currently releasing new drugs and holds a strong pipeline of immunology and oncology treatments in development.

---

[2] *See e.g., Bally Gaming Int'l v, Alliance Gaming Corp.* 1995 U.S. Dist. Lexis 14485 (D. Del. Sept. 29, 1995) (ordering the extension of a tender offer for 15 business days after the filing of an 8-page supplement to the tender offer statement.)

11. Defendant H. Thomas Watkins ("Watkins") is the President and Chief Executive Officer of HGS and is a member of the Company's Board of Directors. Defendant Watkins signed HGS's SEC Form 14D-9 dated May 17, 2012 that recommended HGS shareholders reject GSK's $13.00 tender offer. Watkins also signed the letter directed to HGS shareholders dated May 17, 2012 recommending that they reject GSK's $13.00 per share tender offer because it was grossly insufficient and "undervalues the Company and is not in the best interests of HGS stockholders." Defendant Watkins also signed HGS's letter to shareholders dated July 19, 2012 recommending that they now tender their HGS shares to GSK for $14.25 per share.

12. Defendant Dr. Argeris N. Karabelas ("Karabelas") is the Chairman of the Board of Directors, Chair of the Finance Committee, and is a member of the Company's Compensation Committee. Karabelas signed the letter directed to HGS shareholders dated May 17, 2012 recommending that they reject GSK's $13.00 per share tender offer because it was grossly insufficient and "undervalues the Company and is not in the best interests of HGS stockholders." Defendant Karabelas also signed HGS's letter to shareholders dated July 19, 2012 recommending that they tender their HGS shares to GSK for $14.25 per share.

13. Defendant GSK is a public limited company organized under the laws of England and Wales and based in London, United Kingdom. It is one of the world's largest research-based pharmaceutical and healthcare companies. GSK is focused on developing and marketing prescription medicines, vaccines and consumer healthcare products.

**JURISDICTION AND VENUE**

14. This Court has original jurisdiction over the subject matter of this class action pursuant to 28 U.S.C. § 1332. Plaintiffs Roland David and Avigdor Moche are each citizens of New York. Defendant HGS is a Delaware corporation that maintains its principal place of business in Rockville, Maryland. Moreover, Defendants Watkins and Karabelas are not citizens of New York. The amount in controversy exceeds $5,000,000.00.

15. This Court also has original jurisdiction over the subject matter of this class action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

**FURTHER SUBSTANTIVE ALLEGATIONS[3]**

*Background*

17. Founded in 1998, HGS is a biopharmaceutical company specializing in using the human DNA sequence to develop protein and antibody drugs to treat patients with unmet medical needs. The Company's most notable success to date has been the development of BENLYSTA®, the first new drug approved for the treatment of lupus in more than 50 years. Lupus is a systemic autoimmune disease in which the body's immune system attacks the body's cells and tissues. Lupus can affect any part of the body, but is most common in the heart, joints, skin, lungs, blood vessels, liver, kidney and nervous

---

[3] Plaintiffs make the allegations contained in this Complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, *inter alia*, a review of documents filed by Defendants with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases and other publicly available documents.

system.  The course of the disease is unpredictable, with periods of illness (called "flares") alternating with remissions.

18. GSK is a British multinational pharmaceutical, biologics, vaccines and consumer healthcare company headquartered in London, United Kingdom.  It is one of the top 5 pharmaceutical companies in the world, with a network of 74 manufacturing sites and research and development centers in the United Kingdom, the United States, Spain, Belgium and China.

19. GSK and HGS have had a close and productive business relationship for many years, entering into an agreement in 2006 for the co-development and co-commercialization of BENLYSTA.  In addition, HGS has developed products for GSK pursuant to its 2004 license agreement and procured substantial financial rights to darapladib, a treatment for chronic coronary heart disease, and albiglutide, a treatment for type 2 diabetes mellitus.  Notably, GSK plans to seek regulatory approval to sell albiglutide in the U.S. and Europe, and HGS is entitled to fees and milestone payments for albiglutide that could reach $183 million plus global sales royalties.

20. In April 2012, GSK made an offer for HGS at the fire-sale price of $13.00 per share, or $2.59 billion in the aggregate, although the Company had traded in the $14.00 range within the preceding 7-month period.  HGS management rightfully rejected this overture, finding the consideration to reflect a vastly deficient valuation of the Company and describing the offer as an opportunistic move to capitalize on the Company's temporarily depressed share price.  In its May 17, 2012 press release, the Company stated, *inter alia*:

*The Offer is inadequate and does not capture HGS' inherent value and growth opportunities*. The Board believes that the Offer is inadequate and undervalues HGS because it does not capture the inherent value in the Company's assets, operations and growth opportunities, including the significant upside potential represented by BENLYSTA and the Company's valuable pipeline.

HGS is a fully integrated biopharmaceutical company with leading genomic and drug discovery, development, manufacturing and commercialization capabilities. HGS' leading genomic and drug discovery platform has yielded BENLYSTA and darapladib, each with multi-billion dollar peak sales potential. HGS continues to lead the clinical and regulatory development of BENLYSTA in the U.S., including the development of new indications for BENLYSTA in autoimmune diseases. HGS has state-of-the art biologics manufacturing capabilities, extensive experience in developing manufacturing processes to support early- and late-stage clinical development programs, and deep sales and marketing experience in the complex and attractive systemic lupus erythematosus ("SLE") market. *The Board believes that this combination of capabilities – combining discovery and development capabilities with biologics manufacturing and commercialization expertise – is valuable for biotechnology companies and not fully reflected in the Offer*.

21.     GSK then quickly took its bid hostile and initiated an unsolicited tender offer of $13.00 to HGS's shareholders, and again met resistance from HGS, which implemented a so-called "poison pill" – or Shareholder Rights Plan – which activates when a third party acquires 15 percent of HGS's stock without Board approval. The poison pill would then give HGS shareholders the right to purchase additional shares at a discount, forcing the dilution of GSK's holdings acquired through the hostile overture. In turn, GSK looked to replace HGS's current Board of Directors with members of its own choosing.

22.     GSK would ultimately extend its hostile tender offer through July 16, 2012 and, as that closing date was set to expire, increased its tender offer to $14.25 per share . The Company then reversed course and Defendants announced that they had entered into

8

the Merger Agreement contemplating the sale of HGS to GSK. This is, by definition, a new offer necessitating, under Federal law, that Company shareholders be provided with a minimum of 20 business days to consider the new offer. The execution of the Merger Agreement fundamentally altered the complexion of the Tender Offer from hostile to friendly. Consequently, shareholders will be considering vastly different factors in weighting the merits of the Tender Offer.

23. The Proposed Acquisition was announced via joint press release between the Company and GSK on July 16, 2012, and the closing of the Tender Offer was announced for July 27, 2012. The press release gave only a generalized explanation for the Company's acceptance of the revised Tender Offer and the Merger Agreement filed with the SEC the same day discussed the mechanics of the process, but not an explanation for why the Tender Offer was in the best interest of the Company and its shareholders. Moreover, the July 16, 2012 fails to include any analysis from any financial advisor.

24. Finally, after the close of business on July 19, 2012, HGS issued an 80-page amendment to the Proxy now recommending that the Company's investors tender their shares at the $14.25 price by the July 27, 2012 closing date. As such, HGS's shareholders have only 6 business days to review this recommendation and make an informed decision as to whether it is in their interest to tender their shares.

25. Section 14(e) of the Exchange Act is designed to "insure that public shareholders who are confronted with a tender offer will not be required to respond without adequate information. Moreover, SEC Rule 14d-4(d)(1) states that "a material change in the information published or sent or given to security holders shall be promptly

disseminated to security holders in a manner reasonably designed to inform security holders of such change." Courts have interpreted these disclosure requirements as necessitating an appropriate amount of time for investors to review said materials prior to the closing of the tender.

26. Defendants have violated the federal securities laws and should be enjoined from closing the Tender Offer on July 27, 2012 and said Tender Offer should be held open for a reasonable period of time in order to allow HGS's investors the opportunity to review its terms and the recommendation of the Company in a meaningful manner.

## IRREPARABLE HARM

Plaintiffs have no adequate remedy at law. Only through the exercise of the Court's equitable power will HGS's shareholders be protected from irreparable injury that would arise from being forced to make a decision on tendering their shares without the appropriate amount of time necessary for a deliberative decision. Indeed, once the Proposed Acquisition is complete, it will be very difficult if not impossible to obtain a rescission of the transaction or receive adequate monetary damages. This is because the proposed $3.6 billion merger could be completed almost immediately following the expiration of the Tender Offer, provided that a sufficient number of shares have been tendered.

## CLASS ACTION ALLEGATIONS

27. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all shareholders of HGS (except the Defendants herein, and any person, firm, trust, corporation or other entity

related to or affiliated with any of the Defendants) who stand to be harmed by the Defendants' illegal actions described herein (the "Class").

28. This action is properly maintainable as a class action.

29. A class action is superior to other available methods of fair and efficient adjudication of this controversy.

30. The Class is so numerous that joinder of all members is impracticable. As of July 16, 2012, HGS had approximately 200 million shares of common stock outstanding. Consequently, the number of Class members is believed to be in the thousands and are likely scattered across the United States. Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

31. There are questions of law and fact which are common to all Class members and which predominate over any questions affecting only individuals, including:

    a. whether the Defendants violated the Federal Securities Laws by failing to give HGS shareholders adequate time to review material disclosure information before being forced to make a decision on whether to tender their shares; and

    b.

    c. whether the Class is entitled to injunctive relief and/or damages.

32. Plaintiffs' claims and defenses are typical of the claims and defenses of other class members and Plaintiffs have no interests that are antagonistic or adverse to the interest of other class members. Plaintiffs will fairly and adequately protect the interest of the Class.

33. Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

34. Defendants have acted in a manner that affects Plaintiffs and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

35. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

## CAUSE OF ACTION
## COUNT I

**(Violation of Section 14(d) and 14(e) of the Exchange Act Against All Defendants)**

36. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

37. On May 17, 2012, GSK made a Tender Offer to acquire at least a majority of the outstanding shares of HGS for $13.00 per share, and HGS advised its shareholders to reject this tender offer as not representing the true value of the Company.

38. On July 16, 2012, GSK revised its tender offer to $14.25 per share and HGS agreed to recommend this Tender Offer to its shareholders. The significant changes

to the terms of the Tender Offer means that shareholders will be considering vastly different factors in weighting the merits of the Tender Offer.

39. Nevertheless, the Proposed Acquisition was announced via joint press release between the Company and GSK on July 16, 2012, and the closing of the Tender Offer was announced for July 27, 2012. The press release gave only generalized explanations for the Company's acceptance of the revised Tender Offer and the Merger Agreement filed with the SEC the same day discussed the mechanics of the process, but not an explanation for why the Tender Offer was in the best interest of the Company and its shareholders.

40. Finally, after the close of business on July 19, 2012, HGS issued an 80-page amendment to the Proxy recommending that the Company's investors tender their shares at the $14.25 price by the July 27, 2012 closing date. As such, HGS's shareholders have only 6 business days to review this recommendation and make an informed decision as to whether it is in their interest to tender their shares. HGS investors must be afforded sufficient time to consider GSK's new proposal and the HGS recommendation regarding same before being asked to make their tender decision.

41. By failing to give HGS's shareholders a meaningful chance to review material information regarding the Tender Offer, Defendants have violated Sections 14(d) and 14(e) of the Exchange Act.

**RELIEF REQUESTED**

**WHERFORE,** Plaintiffs demand injunctive relief, in their favor and in favor of the Class, and against the Defendants as follows:

A. Certifying this case as a Class Action, certifying the proposed Class and designating Plaintiffs as representatives of the Class;

B. Enjoining Defendants and any and all other employees, agents, or representatives of the Company and persons acting in concert with any one or more of any of the foregoing, from closing the Tender Offer for a reasonable period of time allowing HGS's investors the opportunity to review the Tender Offer and the Amendment and make an informed decision on whether to tender their shares;

C. Awarding Plaintiffs and the Class appropriate compensatory damages, together with pre- and post-judgment interest;

D. Awarding Plaintiffs the costs, expenses and disbursements of this action, including reasonable attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

E. Awarding Plaintiffs and the Class such other relief as this Court deems just, equitable and proper.

Dated: July 20, 2012                          Respectfully submitted,

OF COUNSEL:                                   **COOCH AND TAYLOR, P.A.**

**BLOCK & LEVITON LLP**                       By: */s/ Blake A. Bennett*
Jason M. Leviton                              Blake A. Bennett (#5133)
Mark A. Delaney                               The Brandywine Building
Steven Harte                                  1000 west street, 10th floor
155 Federal Street, Suite 1303                P.O. Box 1680, Wilmington DE 19899-
Boston, Massachusetts 02110                   1680
(617) 398-5600

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
Jeremy A. Lieberman

14

Jason S. Cowart
Gustavo F. Bruckner
Samuel J. Adams
Ofer Ganot
600 3rd Avenue, 20th Floor
New York, NY 10016
(212) 661-1100

**BRONSTEIN GEWIRTZ & GROSSMAN LLC**
Peretz Bronstein
60 East 42nd Street
New York, NY 10165
(212) 697-6484